## GREEN v. MILLS.

### (Circuit Court of Appeals, Fourth Circuit. June 11, 1895.)

### No. 136.

1. JURISDICTION OF CIRCUIT COURT OF APPEALS—CONSTITUTIONAL QUESTIONS.

The mere fact that the validity of a state law under the constitution of the United States is drawn in question will not, of itself, deprive the circuit court of appeals of jurisdiction to decide other questions involved in the case, although the judiciary act of March 3, 1891, provides, in section 5, for direct appeals from the circuit to the supreme court, when constitutional questions are involved. And, if it appears that the case may be disposed of upon grounds independent of the constitutional question, the court will take jurisdiction, and dispose of it accordingly. *Held*, therefore, that where, on appeal from an interlocutory injunction, it appeared that, while the bill challenged the constitutionality of a state law, the further question was also raised whether the case was one of equitable cognizance, the court would take jurisdiction, and, being of opinion that the case was not of equity cognizance, would dissolve the injunction, and order the bill dismissed.

2. EQUITY JURISDICTION — ENJOINING POLITICAL OFFICER — REGISTRATION OF ELECTORS.

A court of equity has no jurisdiction, upon a bill asking relief in behalf of plaintiff and all other citizens similarly situated, to enjoin a county supervisor of registration from performing the duties prescribed by the state registration laws, on the ground that such laws are unconstitutional, and operate to deprive plaintiff and others of their right to vote.

Appeal from the Circuit Court of the United States for the District of South Carolina.

This was a bill of complaint filed in the circuit court of the United States for the district of South Carolina April 19, 1895, by Lawrence P. Mills, described as "a citizen of the state of South Carolina and of the United States," against W. Briggs Green, described as "a citizen of said state and the United States," and exhibited on behalf of complainant and all other citizens of the county of Richland, in the state of South Carolina, circumstanced like himself, and too numerous to be made parties, alleging that complainant was 21 years of age February 4, 1895; that he is a resident of ward 4, precinct of Columbia, in said county and state; that he is a male citizen of the United States; that he has resided in the state of South Carolina for more than one year preceding the last general election in that state, and in the county of Richland for more than 60 days prior to the said general election; that complainant is an elector of the state of South Carolina, possessing all the qualifications of an elector of the most numerous branch of the state legislature, provided by the state constitution, and that he is subject to none of the disqualifications set forth in said constitution; and that he is, under the constitution and laws of the United States, duly qualified to vote at all federal and state elections held in said ward, county, and state.

The bill then set forth section 90 of the General Statutes of South Carolina of 1882, as follows: "All electors of the state shall be registered as hereinafter provided; and no person shall be allowed to vote at any election hereafter to be held unless registered as hereinafter required." And section 132 of the Revised Statutes of South Carolina of 1893 to the same effect: "All electors of this state shall be registered, and no person shall be allowed to vote at any election hereafter to be held unless he shall have heretofore registered in conformity with the requirements of chapter 7 of the General Statutes of 1882, and acts amendatory thereof, or shall be registered as herein required." And also section 94 of the General Statutes of 1882, providing: "When the said registration [in certain books to be provided him and made in the manner provided for in section 93] shall have been completed the books shall be closed and not reopened for registration except for

the purposes and as hereinafter mentioned until after the general election for state officers. After the said next general election the books shall be opened for the registration of such persons as shall thereafter become entitled to register on the first Monday in each month to and until the first Monday in July, inclusive, preceding the following general election, upon which last named day the same shall be closed and not reopened for registration until after the said general election, and ever after the said books shall be opened for the registration of such electors, and on the days above mentioned, until the first day of July preceding a general election, when the same shall be closed as aforesaid until the said general election shall have taken place." And in section 137 of the said Revised Statutes of 1893 it is provided: "After every general election the registration books shall be opened for registration of such persons as shall thereafter become entitled to register on the first Monday in each month until the first day of July preceding a general election, when the same shall be closed until such election shall have taken place." And also section 97 of the General Statutes of 1882, in the following words: "Any person coming of age and becoming qualified as an elector may appear before the supervisor of registration on any day on which the books are opened as aforesaid and take oath as to his age and qualification, as hereinbefore provided, and if the supervisor find him qualified he shall enter his name upon the registration book of the precinct wherein he resides."

It was further alleged "that, in and by the requirements of said registration enactments of the government of the state of South Carolina, it is provided that the respective supervisors of registration in the several counties shall issue to the voter when registered a certificate of registration, and that said voter shall present the same at the polls to the managers of election, and that no one shall be allowed to vote at any election to be held in the said state unless his certificate of registration as aforesaid is exhibited at the time and in the manner aforesaid. And it is further required, in and by the said alleged enactments, that, in case a voter or elector shall remove from one county to another in said state, or from one precinct to another in the same county, or from one residence to another in the same precinct, he shall obtain a transfer and a renewal certificate. And it is further provided, in said enactments, that, in the event an elector shall lose his said certificate of registration, he must obtain a renewal thereof upon furnishing evidence satisfactory to the registrar of the said county wherein he resides that his said certificate has been mislaid or lost, and that the same has not been wilfully or intentionally disposed of." And it was averred "that, by the provisions and requirements of said enactments, the elector failing for any reason to comply with any of the provisions aforesaid is denied the right of suffrage both in federal and state elections," and "that the provisions of the said enactments fixing the time for registration and the closing of the books for that purpose on the 1st day of July preceding every election, and the many and divers provisions, requirements, and conditions set out in the various and sundry sections of said alleged act, were intended to, and that they in effect do, abridge, impede, and destroy the suffrage of the citizen both of the state and of the United States."

The bill further averred the passage on the 24th day of December, 1894, by the government of the state of South Carolina of an act to provide for calling a constitutional convention, by section 4 of which it was declared who should be entitled to vote for delegates to the said constitutional convention; and in addition to the qualifications prescribed for electors by the constitution of the state of South Carolina, a further qualification was provided, to wit, that the elector be "duly registered as now required by law, or who, having been entitled to register as a voter at the time of the general registration of electors in the state which took place in the year of our Lord 1882, or at any time subsequent thereto, failed to register at such time required by law, or who has become a citizen of this state and who shall register as hereinafter provided in such cases." Sections 6 and 7 of this act were set forth as follows: "That on the first Monday of March, in the year of our Lord 1895, the supervisor of registration of each county shall, at the county seat thereof, open his books of registration, and shall hold the same

open for ten-consecutive calendar days thereafter, except Sundays, between the hours of 10 o'clock in the forenoon and 4 o'clock in the afternoon, except Charleston, Beaufort, and Richland counties, where the said books shall be kept open from 10 o'clock in the forenoon to 6 o'clock in the afternoon, during which time any elector then or theretofore at any time entitled to register as a qualified voter, or who has become a citizen of this state, shall be, during the time herein fixed by law for registration, entitled to register as such, as hereinafter provided; and any elector having been heretofore duly registered, or having since changed his residence, or having lost his certificate, shall be entitled to have the same transferred or renewed, as now provided by law." "Any elector who shall have been entitled to register at the general registration in the year of our Lord 1882, or at any time subsequent thereto, and who failed to register at such time as required by law, and who shall make application under oath in accordance with the printed form to be prepared by the attorney general, setting forth in each case the fact, to wit: The full name, age, occupation and residence of the applicant at the time of the said general registration, or at any time thereafter, when the said applicant became entitled to register, and the place or places of his residence since the time he became entitled to register, which affidavit shall be supported by the affidavits of two reputable citizens who were each of the age of 21 years on the 13th day of June, A. D. 1882, or at the time the said applicant became entitled thereafter to register, or any elector who has become a citizen of this state, by moving into the same and his place of residence since living in the state and who shall make application under oath, stating the time of his moving into the state and his place of residence since living in the state, which application shall be supported by the affidavit of two reputable citizens, who were 21 years of age at the time the applicant became a resident of this state, such applicant shall be allowed to register as a voter and to have issued to him a certificate as a duly qualified elector in the manner and form now provided by law, and be entitled to vote at said election for delegates to said convention."

The bill then charged that these sections so limited, abridged, and qualified the privilege of registration that they resulted in a practical denial of the right to vote to those electors who, by the operation of the provisions of the General Statutes of 1882 and Revised Statutes of 1893, are now unregistered; and that they were "so interwoven with, and are such integral parts of, the whole alleged registration laws of the state of South Carolina, that, if the same be declared unconstitutional and void, as herein prayed, the whole enactments in regard to registration are likewise void." And it was charged that said sections were in violation of the constitution of the state of South Carolina, and of section 2 of article 1, section 1 of amendment 14, and section 1 of amendment 15, of the constitution of the United States.

The bill continued, and concluded as follows:

"(10) By section 2 of the aforesaid act of 1894 it is provided that the election of delegates to the said constitutional convention shall be held on the third Tuesday in August, 1895; that the said convention shall assemble on the second Tuesday of September, 1895; that such convention is called for the purpose of revising, amending, or changing the constitution of said state, and when assembled will have full power to revise, alter, abridge, curtail, and qualify the right of your orator and of all citizens of the said state of South Carolina to vote for the members of the most numerous branch of the state legislature, and thereby to revise, alter, abridge, and curtail the qualifications now requisite to enable your orator to vote at all federal elections as now imposed by the constitution of the United States. (11) That W. Briggs Green has been appointed to the office of supervisor of registration for Richland county aforesaid, under and in pursuance of the said unconstitutional registration laws; that he is now exercising the duties prescribed by the same, and your orator has been informed and believes that he intends to continue so to do, and, furthermore, he specifically intends to furnish and deliver to the several boards of managers for the several precincts of Richland county aforesaid, to be hereafter appointed, to hold the election of delegates to the said constitutional convention, certain paper writings purporting to be the registration books aforesaid of the several pre-

cincts to be used by said managers at said approaching election. (12) Your orator further shows that, under and by virtue of the said unconstitutional registration laws, the supervisors appointed thereunder are required to continue said partial, void, and illegal registration on the first Mondays in May and June and July, 1895, and that after the 1st day of July, 1895, they are directed by section 8 of the act of 1894 to 'furnish the managers at each precinct with one of the registration books for such precinct, and no elector shall be entitled to vote whose name is not registered as hereinbefore or already provided by law, and who does not produce his registration certificate at the polls where he offers to vote.' (13) That your orator failed to register at the registration made after the general election of 1888, or to be registered during the 10 days in March, 1895, provided for in said act of 1894, because, although he made repeated and persistent efforts to become registered, he found himself unable to comply with the unreasonable, unnecessary, and burdensome rules, regulations, and restrictions, prescribed by said unconstitutional registration laws as conditions precedent to his right to register, and your orator has never been allowed to vote at any federal or state election of the said state of South Carolina. (14) That your orator is desirous of voting for delegates to the aforesaid constitutional convention at the election prescribed by the act of 1894 for the purpose; that the paper writings purporting to be books of registration now in the hands of the said defendant do not and will not contain the name of your orator as a registered voter for the reasons hereinbefore stated; that your orator, and others like circumstanced with him, will not be permitted to vote at said special election by the managers thereof unless their names be found upon the books of registration, and they can produce the registration certificates hereinbefore mentioned; that if the said defendant be permitted to continue the aforesaid illegal, partial, and void registration, and be allowed to turn over to the managers of election for the aforesaid county of Richland (when appointed) said paper writings, purporting to be books of registration for the several precincts in said county, your orator will be deprived of his right to vote at said election, and grievous and irreparable wrong and damage will be done to your orator and a large class of citizens like circumstanced with him, which can be prevented only by the interposition of this court by way of restraining the said defendant from the performance of any of the acts hereinbefore referred to. To the end, therefore, that your orator may have full, perfect, and sufficient relief in the premises, may it please your honors to grant unto your orator a writ of injunction restraining and enjoining the said defendant, individually and as supervisor of registration, from the performance of any of the acts hereinbefore complained of, and that your orator may have such other and further relief in the premises as may be just and reasonable."

Then followed the prayer for process. The bill was sworn to by complainant as "true to the best of his knowledge and belief," and, on preliminary application, the following order was entered: "It is ordered that the defendant, W. Briggs Green, both individually and as supervisor of registration for Richland county, in the state of South Carolina, be enjoined and restrained until the further order of this court from the commission of any of the acts complained of in the above-entitled bill, a copy of which must be served upon him with this order. It is further ordered that the said W. Briggs Green do show cause before me at Columbia, S. C., on Thursday, the 2d day of May, next, why this order should not be continued, or some order of like purport and effect be then granted, enjoining and restraining him, both individually and as such supervisor of registration, from the commission of any of the acts complained of in said bill until the final hearing and determination of this cause. This hearing shall be in the United States circuit court room, Columbia, S. C."

Subpoena was issued returnable on the first Monday of June. On May 2, 1895, cause was shown by defendant under the rule, defendant stating, among other things: "(1) That he is supervisor of registration for Richland county, in the state of South Carolina, and as such is not amenable to the jurisdiction of the court for his conduct in his political capacity aforesaid; that the matters, facts, and things alleged and complained of

in the said bill, and upon which the injunction has been improvidently granted, are all matters relating to the political duties of the office. That this is in effect a suit against the state of South Carolina, in violation of the eleventh amendment to constitution of United States, and this court has no jurisdiction. (2) That he submits that the bill presents no question arising under the constitution or laws of the United States to give jurisdiction to this honorable court. (3) That he submits that the bill presents no case upon which the jurisdiction of a court of equity can be founded, as there are plain and adequate remedies at law for the correction of any of the matters and things alleged, if so be that the allegations are true. (4) That the bill is totally defective for the purposes of the motion in its allegations and in the verification, in this: that there is no sufficient averment of irreparable injury and statement of facts supporting it, and that the material facts on which the injunction is sought are not positively sworn to by the complainant."

On May 8, 1895, the cause having been argued upon bill and return, the circuit court filed an opinion (reported 67 Fed. 818), and entered the following order: "It is ordered, that the restraining order heretofore granted by this court, bearing date the 16th day of April, 1895, enjoining and restraining the said respondent from exercising duties or performing any acts complained of in the said bill of the complainant, either individually or as supervisor of registration for the county of Richland, state aforesaid, be, and the same is hereby, continued, subject to the final determination of the issues involved in this case until the further order of this court." From this order an appeal was prayed and allowed to this court, errors being duly assigned covering the points made on the return. Objections to the docketing of the case were made and overruled, and the appeal was heard June 7th, and decree entered June 11, 1895, reversing the order of the circuit court, dissolving the injunction, and remanding the case with directions to dismiss the bill.

W. A. Barber, Atty. Gen., Edward McCrady, and Geo. S. Mower, for appellant.

H. N. Obear and Chas. A. Douglass, for appellee.

Before FULLER, Circuit Justice, and HUGHES and SEYMOUR, District Judges.

FULLER, Circuit Justice (after stating the facts as above). It is contended on behalf of appellee that jurisdiction of this appeal cannot be entertained, because if the case went to final decree an appeal therefrom would lie only to the supreme court. Under section 7 of the judiciary act of March 3, 1891, where, upon a hearing in equity in the circuit court, an injunction is granted or continued by an interlocutory order or decree, "in a cause in which an appeal from a final decree may be taken under the provisions of this act to the circuit court of appeals, an appeal may be taken from such interlocutory order or decree granting or continuing such injunction to the circuit court of appeals." By section 5 of that act, appeals or writs of error may be taken directly to the supreme court "in any case in which the jurisdiction of the court is in issue. In such cases the question of jurisdiction alone shall be certified to the supreme court from the court below for decision," "in any case that involves the construction or application of the constitution of the United States," or "in any case in which the constitution or law of a state is claimed to be in contravention of the constitution of the United States."

It was early held, in McLish v. Roff, 141 U. S. 661, 12 Sup. Ct. 118, that the act gave to a party to a suit in the circuit court, where the

question of the jurisdiction of the court over the parties or subject-matter was raised and put in issue upon the record, at the proper time and in the proper way, the right to a review by the supreme court, after final judgment or decree against him, of the decision upon that question only, or by the circuit court of appeals on the whole case. Maynard v. Hecht, 151 U. S. 324, 14 Sup. Ct. 353. And in Carey v. Railway Co., 150 U. S. 170, 14 Sup. Ct. 63, it was ruled that, in order to hold an appeal maintainable under the second of the above-named classes, the construction or application of the constitution of the United States must be involved as controlling, although on appeal or error all other questions would be open to determination, if inquiry were not rendered unnecessary by the ruling on that arising under the constitution. Horner v. U. S., 143 U. S. 570, 12 Sup. Ct. 522. In U. S. v. Jahn, 155 U. S. 109, 15 Sup. Ct. 39, the supreme court decided that, if the question of jurisdiction is in issue, and the jurisdiction sustained, and judgment or decree on the merits is rendered in favor of the plaintiff, then the defendant can elect either to have the question certified, and come directly to the supreme court, or to carry the whole case to the circuit court of appeals, where the question of jurisdiction can be certified by that court.

In view of these and other cases, we are of opinion that, where the jurisdiction is not in issue, but the question of the constitutionality of a state law is raised, and must necessarily be decided in the disposition of the case, there the case on final decree should be taken directly to the supreme court. But, where the jurisdiction depends on the existence of a federal question, which is controverted, the jurisdiction sustained, and the case goes to decree on the merits, the defendant may take the whole case to the circuit court of appeals. Whether that court, if the conclusion were reached that the constitutional question was controlling in the premises, should remand the case to the circuit court, or may certify the question to the supreme court, we are not called upon to determine. Here the jurisdiction of the circuit court rested on the existence of a federal question, namely, the validity of the state laws, challenged as in contravention of the constitution and laws of the United States; but, conceding the jurisdiction, the question arose on the threshold whether the case made or attempted to be made was one of equitable cognizance, and we think that, upon the final decree, an appeal would lie to this court, whether the bill were dismissed on final hearing on that ground or otherwise. The motion to dismiss will therefore be overruled.

The jurisprudence of the United States has always recognized the distinction between common law and equity as, under the constitution, matter of substance as well as of form and procedure. And the distinction has been steadily maintained, although both jurisdictions are vested in the same courts. Fenn v. Holme, 21 How. 481, 484; Thompson v. Railroad Cos., 6 Wall. 134; Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. 883, 977; Mississippi Mills v. Cohn, 150 U. S. 202, 205, 14 Sup. Ct. 75. It is well settled that a court of chancery is conversant only with matters of property and the maintenance

of civil rights. The court has no jurisdiction in matters of a political nature, nor to interfere with the duties of any department of government, unless under special circumstances, and when necessary to the protection of rights of property, nor in matters merely criminal, or merely immoral, which do not affect any right of property. In re Sawyer, 124 U. S. 200, 8 Sup. Ct. 482; Luther v. Borden, 7 How. 1; Mississippi v. Johnson, 4 Wall. 475; Georgia v. Stanton, 6 Wall. 50; Holmes v. Oldham, 1 Hughes, 76, Fed. Cas. No. 6,643. Neither the legislative nor the executive department, said Chief Justice Chase, in Mississippi v. Johnson, "can be restrained in its action by the judicial department, though the acts of both, when performed, are, in proper cases, subject to its cognizance." "The office and jurisdiction of a court of equity," said Mr. Justice Gray, in Re Sawyer, "unless enlarged by express statute, are limited to the protection of rights of property." To assume jurisdiction to control the exercise of political powers, or to protect the purely political rights of individuals, would be to invade the domain of the other departments of government or of the courts of common law.

Similar views have been repeatedly expressed by state tribunals of high authority. Thus, in Fletcher v. Tuttle, 151 Ill. 41, 37 N. E. 683, the supreme court of Illinois say:

"The question, then, is, whether the assertion and protection of political rights, as judicial power is apportioned in this state between courts of law and courts of chancery, are a proper matter of chancery jurisdiction. We would not be understood as holding that political rights are not a matter of judicial solicitude and protection, and that the appropriate judicial tribunal will not, in proper cases, give them prompt and efficient protection, but we think they do not come within the proper cognizance of courts of equity."

In re Sawyer, Georgia v. Stanton, Sheridan v. Colvin, 78 Ill. 237, Dickey v. Reed, Id. 261, Harris v. Schryock, 82 Ill. 119, and many other cases are cited, and the court continues:

"Other authorities of similar import might be referred to, but the foregoing are amply sufficient to show that, wherever the established distinctions between equitable and common-law jurisdiction are observed, as they are in this state, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political, and where no civil or property right is involved. In all such cases the remedy, if there is one, must be sought in a court of law. The extraordinary jurisdiction of courts of chancery cannot, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office; nor can it be invoked for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. These matters involve in themselves no property rights, but pertain solely to the political administration of government. If a public officer, charged with political administration, has disobeyed or threatens to disobey the mandate of the law, whether in respect to calling or conducting an election, or otherwise, the party injured or threatened with injury in his political rights is not without remedy. But his remedy must be sought in a court of law, and not in a court of chancery."

In Hardesty v. Taft, 23 Md. 513, where application was made for an injunction to prevent the use of a register of voters prepared for a certain county, the court of appeals of Maryland observed:

"On this branch of the inquiry, it seems to the court very clear that a court of equity cannot be invoked to prevent the performance of political

duties like those committed to the officers of registration under the law. The willful, fraudulent, or corrupt refusal of a vote by judges of election, or a like denial of registration by the officer appointed to register votes, which is the same thing, can be adequately compensated for in damages at law. Bevard v. Hoffman, 18 Md. 484. The writ of injunction will not be awarded in doubtful or new cases not coming within well-established principles of equity. Bonaparte v. Railroad Co., Baldw. 218, Fed. Cas. No. 1,617. Each voter has a separate and distinct remedy for the willfully improper deprivation of his vote; and the joinder of others, like circumstanced or injured, as complainants in equity, on the ground of avoiding a multiplicity of suits, will not avail to afford equitable relief. To interfere in the mode asked for by the complainants would be to stop a popular election in one portion of the state, and thus arrest, as to it, the wheels of government. For irregularities in the conduct of an election, for receiving illegal or rejecting legal votes, and for the correction of consequences resulting therefrom, the law provides appropriate remedies and modes of procedure. Such matters are not the subjects of equitable jurisdiction."

The general doctrine as to public officials is thus stated by the New York court of appeals in People v. Canal Board, 55 N. Y. 393:

"A court of equity exercises its peculiar jurisdiction over public officers to control their action only to prevent a breach of trust affecting public franchises, or some illegal act under color or claim of right affecting injuriously the property rights of individuals. A court of equity has, as such, no supervisory power or jurisdiction over public officials or public bodies, and only takes cognizance of actions against or concerning them when a case is made coming within one of the acknowledged heads of equity jurisdiction."

Nor will equity interfere by injunction to restrain persons from exercising the functions of public offices, on the ground of the illegality of the law under which their appointments were made, but will leave that question to be determined by a legal forum. The doctrine is clearly established that courts of equity will not thus interfere to determine questions concerning the appointment or election of public officers or their title to office, such questions being of a purely legal nature and cognizable only by courts of law. High, Inj. (3d Ed.) § 1312 et seq., and cases cited. And see Hagner v. Heyberger, 7 Watts & S. 104; Smith v. McCarthy, 56 Pa. St. 359; Smith v. Myers, 109 Ind. 1, 9 N. E. 692; Peck v. Weddell, 17 Ohio St. 271; Kemp v. Ventulett, 58 Ga. 419. The rule is not otherwise in South Carolina. The supreme court of that state has decided upon a similar application for a like injunction, made, as would appear, by this same complainant, that the relief asked "is not the appropriate remedy for the grievance set out." Ex parte Mills, 41 S. C. 554, 19 S. E. 749.

Tested by these principles, this bill of complaint cannot be maintained, for it seeks on behalf of individuals to restrain the exercise of governmental powers, and asserts no threatened infringement of rights of property or civil rights, and no recognized ground of equity interposition. No discrimination on account of race, color, or previous condition of servitude is charged, or pointed out as deducible on the face of the acts in question. No specific application to the defendant as supervisor to register complainant is alleged, but it is said that complainant has failed to register because, in spite of repeated and persistent efforts to that end, he found himself unable

to comply with the provisions of the law in that behalf.    In this regard, the gravamen of the bill is that, although the legislature might require registration under reasonable restrictions as proof of the possession of the qualifications prescribed by the constitution, which is, indeed, made the duty of the general assembly by that instrument (Const. S. C. art. 8, § 3), the requirements of these acts are such as to materially abridge and impair the exercise of the elective franchise and impose additional qualifications to those prescribed; and that therefore the acts are invalid, as in contravention of the constitutions of the state and of the United States.    But, if this were true, it would not follow that complainant would have a locus standi in equity.    The bill is brought to restrain the registering officer from discharging, at all, duties imposed upon him by law in respect of the public, lest complainants and other individuals similarly situated might thereafter be deprived of a political right because of alleged inability to comply with legislative requirements, which he contends are invalid for that reason.    We repeat that the action sought to be enjoined is political and governmental; and it is not pretended that any right of property or civil right is threatened with infringement thereby.

This being so, we are clearly of opinion that no ground of equitable cognizance exists, and, although the appeal is from interlocutory orders, yet, as we entertain no doubt that such a bill cannot be maintained, we are constrained, in reversing these orders, to remand the cause with a direction to dismiss the bill.    And it is so ordered.

HUGHES, District Judge (concurring).    This case was heard by the chief justice, Judge SEYMOUR, and myself, on Friday last, the 7th inst.    We thought it was of a character to call for an early decision, and it was determined, after adjournment on Friday, that the decision should be announced to-day, and a decree entered.    The case was exhaustively argued at the bar, and nothing can be gained by awaiting a further time for the examination of briefs.    We are of opinion that the preliminary injunction which was granted in the case ought to be dissolved and the bill dismissed.    A decree to that effect, prepared by the chief justice, will be entered at once.    The opinion of the court on the important questions presented by the record will be prepared by the chief justice, and filed and reported as soon as practicable.    I have thought that, in the meantime, it was due to the public, and might not be improper in me, to present at once some of the considerations which have led me to the opinion that the injunction of the circuit court below should not have been granted.    I therefore submit what follows.    I have had no opportunity of presenting it to the other judges who sat with me, and am solely responsible for the views expressed.

This bill is brought by the complainant, on his own behalf, and "on behalf of other citizens of the county of Richland, in the state of South Carolina, and the United States," circumstanced like himself. It sets out that he is 26 years of age, and that he is entitled to be registered as a citizen and voter.    It describes, by quotation, in considerable detail, sundry provisions of the registration laws of

South Carolina now in force. It charges that these provisions violate certain clauses of the state constitution, in two respects, viz.: First, by requiring the voter always to be in possession of his certificate of registration, and to present it when offering to vote; and, second, by allowing only 10 days in each year (in the month of March) for the registration of voters who have failed to register at the times provided by law for registration at periods anterior to those 10 days. It charges that the registration laws complained of, by adding a compliance with these two qualifications as necessary to the exercise of the right of suffrage,—these being qualifications which are not required by the state constitution,—thereby violate the state constitution. It adds the charge that these two requirements also violate the constitution of the United States, inasmuch as section 2 of article 1 of that instrument provides that electors for members of congress "in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature." The bill alleges that complainant failed to register at the times designated by law, or within the 10 days set apart for that purpose in March, 1895, for those who had not previously registered, because, although he had made repeated efforts to become registered, he found himself unable to comply with the unreasonable, unnecessary, and burdensome rules, regulations, and restrictions prescribed by the alleged unconstitutional registration laws as conditions precedent to his right to register. He complains that, in consequence of his having thus failed to be registered, he has never been allowed to vote at any state or any federal election in South Carolina. The bill alleges that the defendant, Green, has been appointed supervisor of registration for Richland county under these unconstitutional laws, is exercising the duties prescribed by them, and intends to deliver to the managers of the election in Richland county the registration books, which he is preparing, to be used by them in deciding upon the right of citizens to vote, among other elections, at the first next ensuing election to be held in South Carolina, which will be one to be held in August next for members of a state convention called to frame a new state constitution. The bill alleges, in general terms, that the registration laws of South Carolina, complained of, violate, as before described, section 2 of article 1 of the national constitution, and are also "in violation of section 1 of article 14, and section 1 of article 15, and of divers other sections and articles of the said instrument." As there are but seven articles in the original constitution of the United States, the presumption is that the bill has reference to the fourteenth and fifteenth amendments (not articles) of the national constitution. The complainant therefore prays the court to grant a writ of injunction restraining and enjoining the defendant, Supervisor of Registration Green, individually and officially, from the performance of any of the acts required of him by the registration laws complained of, and for other relief. The court below granted an order temporarily enjoining and restraining Supervisor Green from the commission of any of the acts complained of in the bill, and granted at a later day an order restraining and enjoining this supervisor from exercising duties or performing any

acts complained of in the bill until the further order of the court. From this order appeal is taken to this court.

There is nothing in the record to show that the complainant is a man of color, or that those for whom he sues are colored persons. The bill contains no allegation that the provisions of law complained of were devised against the complainant, or those for whom he sues, on account of their race, color, or previous condition of servitude. There is nothing in the averments of the bill from which it may naturally, or must necessarily, be inferred that the complainant, and those for whom he sues, are citizens of color. There are no averments in the bill which show that the case falls within the purview of the fifteenth amendment of the constitution of the United States. Nor does the bill contain any allegations which raise a federal question under that clause of the fourteenth amendment which forbids a state "to deny to any person the equal protection of the laws." It charges that the effect of the provisions of the registration acts complained of is to give unequal facilities of registration to different classes of citizens, but it does not point out how this is so. It leaves the discrimination as to the privilege of registering, if there be discrimination, to inference, and to research in sources other than its own averments. It charges that the provisions of law complained of discriminate, but does not describe the manner of discrimination, or define the classes affected pro or con, nor does it show that the law complained of, in discriminating between classes, as to the privilege of registering granted by them, violate that clause in the fourteenth amendment which forbids a state "to deny to any person within it, the equal protection of the laws." It confounds privilege with protection. The bill has no reference to a federal election, in setting out complainant's case. The gravamen of the bill contemplates only a state election to be held for members of the state convention called to convene in August next. It is not shown that any federal election is to be held in the state of South Carolina before November, 1896. To the bill thus described, and to the orders of injunction granted by the court below in pursuance of its prayers, several objections are urged, in behalf of the state of South Carolina. In what follows I shall consider but one of these.

I regret that I cannot concur in the ruling of the circuit court rendered on circuit in this case, in which it was held that the court had jurisdiction to restrain a county supervisor of registration in the performance of his duties under the election laws of South Carolina. The division of our government into the legislative, executive, and judicial departments is a distinguishing feature of our American polity, and it is essential to its existence that each of these departments shall be independent of the other. This is fundamental and organic. It would be just as dangerous to its stability for the judicial department to override the others as for the executive or legislative department to do so. Hence, while the right of the judiciary to pass upon the constitutionality of laws is undoubted, it has that right simply as an incident to its protection of private rights. It has not that right as a

mere means of settling abstract questions, and, even in the enforcement of private rights, it has not the power to interfere with the discretion vested in the other departments, or with the exercise of the political powers of those departments. It seems to me that it is a dangerous encroachment upon the prerogatives of the other departments of government, if the judiciary be intrusted to exercise the power of interfering with the holding of an election in a state. If the supervisor of one county can be enjoined from the performance of the duties imposed upon him by the election laws of the state from whom he holds his commission, those of the other counties can be also. Thus, a single citizen in each county (and in the case at bar he is not even a qualified voter) can enjoin an election throughout the entire state, and thus deprive thousands of their right to vote. If a court has power to do this, free elections are at an end. If elections are improperly held, there are appropriate means provided by law for questioning their results, and remedying wrongs, without the exercise of this dangerous power by the courts. A candidate who has been defeated may contest; a voter whose right to register has been denied may proceed to compel the enforcement of that right; and these privileges give what the legislature deems sufficient protection to the injured. But, in my judgment, one citizen cannot, in an endeavor to right his own wrongs, disfranchise others. I do not think that a court has jurisdiction to interfere, by injunction or otherwise, with the enforcement of laws by officers holding and deriving their powers from these laws; certainly not to the extent in which it is attempted to be done by this bill. In arriving at this conclusion I have not considered the question whether or not the registration laws of South Carolina violate the federal constitution or laws. I prefer to rest my opinion upon the ground of the independence of the different departments of government; upon the impolicy of interference by the courts in questions which will result in dragging them constantly into the arena of party politics; and upon the general principle that each department of the government, and each officer thereof, high or low, has the right to administer, according to his best judgment, the duties imposed upon him by the laws creating his office. As illustrating these general principles, I refer to the following decisions: Mississippi v. Johnson, 4 Wall. 475; Gaines v. Thompson, 7 Wall. 347; Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128; Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608; Ex parte Ayers, 123 U. S. 443, 8 Sup. Ct. 164; In re Sawyer, 124 U. S. 209, 8 Sup. Ct. 482. It is useless to cite the many other cases which bear on the questions arising in this case, and cited so profusely at the bar. In the case of Mississippi v. Johnson, which was a bill to enjoin the president of the United States and the military commandant of the military district of Mississippi from carrying into effect certain provisions of the reconstruction acts of 1867, the supreme court said that "an attempt on the part of the judicial department of the government to enforce the performance of the (executive and political) duties of the president might be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and

excessive extravagance.'" "It is true," says the court, "that in the instance before us the interposition of the court is not sought to enforce action by the executive under constitutional legislation, but to restrain such action under legislation alleged to be unconstitutional. But we are unable to perceive that this circumstance takes the case out of the general principles which forbid judicial interference with the exercise of executive discretion. The congress is the legislative department of the government. The president is the executive department. Neither can be restrained in its action by the judicial department, though the acts of both, when performed, are, in proper cases, subject to its cognizance." This language of the supreme court is quoted to show that the court was at pains to distinguish between acts of public officers which were political and executive, and those which were merely ministerial, and between duties of officers as officers, and those which belong to persons as mere citizens. These distinctions are carefully adhered to by the supreme court in the subsequent decisions which I have cited. I do not think it necessary to point out how particularly and carefully it has done so, in those cases.

In the one at bar the person enjoined from the performance of duties was an officer of the executive department of the government, and he was enjoined as an officer, and not as a citizen, from performing political functions. The duties which he was discharging were political,—exclusively political,—and did not appertain to him as a private citizen. I think the teaching of the cases I have cited is clear that a court cannot, by injunction, prohibit a public officer generally from discharging political duties imposed by law. If the law be vicious, the remedy must be sought elsewhere than in the courts. Probably the homely way of getting rid of a bad law, recommended by Gen. Grant, is the best, viz. by enforcing it rigidly. I do not think that the fact was so; but let it be admitted, for the sake of argument, that the duties of the registration officer who was enjoined in this case were entirely ministerial, affording no room for discretion. Yet they were strictly political. They dealt with that prime subject in a republic,—the elective franchise. The duties were prescribed by legislation, and the performance of them was an executive act. For the court to enjoin an executive officer generally from discharging those duties was for the judiciary to invade the province of both the other two independent departments at once. It was, so far as the injunction operated, a nullification of legislation, and a prohibition of the performance of important executive duties.

So far as the rights of the individual complainant in the bill were concerned it may have been competent for the court to grant individual relief. The supreme court of the United States the other day granted relief from the payment of an income tax to the individual complainant in the suit before it, but it went no further. On the authority of Mississippi v. Johnson, supra, we may assume that it would not have entertained a bill for enjoining internal revenue officers of the government from collecting income taxes generally. The judicial power covered the right to grant individual relief, but did not extend to the general power of repealing the

law imposing the tax, as to the entire public. **I repeat that in the** case at bar it may have been competent for the court to grant individual relief. But the bill asked more. It asked similar relief for all citizens of the county situated like the complainant. It practically asked relief for a numerous political party, forming a portion of that people to whom the legislature was solely responsible for its laws, and to whom alone the genius of our institutions makes the legislature responsible. Moreover, it brought the court into immediate and active contact with party contestation. It made the court a controlling factor in party strife. I can imagine nothing more pernicious than a direct participation by the judiciary, by judicial action, in the politics of the people. The bill asked, practically, that the process of registration under the laws of the state should be suspended in an entire county during the pleasure of the court, and that all the citizens of a county not then registered as voters should be denied the right of suffrage during that pleasure. It seems to me that the mere statement of this view of the case shows that the injunction was improvidently granted. I think the bill should be dismissed.